IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BRAD JACKSON<br><br>Plaintiff<br><br>v.<br><br>BARRY GREENBERG et al.<br><br>Defendants | Case No. 4:24-cv-01207-NCC |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT**

On the basis of at present uncontroverted facts, Defendant Chosich engaged in a persistent, years long campaign of lobbing caustic defamatory bombs at Plaintiff Jackson with the specific intent of humiliating and demeaning him. Each of the pled statements relied upon by Jackson is on its face is defamatory in a variety of ways. Considered in the context of Defendant Chosich's campaign, any of the vague half truths relied upon Defendant Chosich to defend his conduct cannot as a matter of law defeat Jackson's defamation claims against him.

1. <u>The undisputed conduct of Defendant Chosich both in the pled and relied upon statements from the Complaint and considered in the context of his ongoing defamatory campaign makes plain that the statements are unlawful, unprotected, and repugnant.</u>

Defendant Isaac Chosich has conducted a sustained campaign of defamatory statements against Plaintiff Brad Jackson across multiple online platforms and in written communications. This campaign includes false accusations of criminal conduct, business fraud, and personal misconduct that are demonstrably false based on the uncontroverted record evidence. On May 6, Defendant Chosich published a Facebook post stating that Jackson "tried to blackmail a city council member with nudes he claimed he had of her" in connection with an ethics hearing. *See* Exhibit 3.

This statement falsely characterizes the underlying ethics matter, which Jackson himself initiated against Chastity Mattox for her unwanted sexual advances toward him. *See* Affidavit of Brad Jackson ¶ 8; Exhibit 9 (Ethics Complaint). The ethics complaint did not involve any alleged "blackmail with nudes" but rather concerned Mattox's false claims that Jackson made sexual advances toward her, when in fact Mattox sent Jackson dozens of unsolicited sexual messages describing how she and her husband were "swingers" and wanted Jackson to sleep with them. *See* Affidavit of Brad Jackson ¶ 8.

In the same May 6 Facebook post, Chosich stated that Jackson "doesn't have a job, doesn't pay taxes, doesn't pay rent, [and] doesn't pay child support." *See* Exhibit 3. Each of these statements is demonstrably false. Jackson is the owner and operator of Roughneck Beard Company, a legitimate business that produces beard oil containing eight different carrier oils. *See* Affidavit of Brad Jackson ¶¶ 4-5. Jackson files and pays federal taxes annually. *See* Reply to Defendant's Statement of Uncontroverted Material Facts ¶ 16; Exhibit 12 (tax returns). Most significantly,

Jackson is not required to pay child support under any court order, as the family court judgment established 50/50 custody with no child support obligation. *See* Affidavit of Brad Jackson ¶ 6; Exhibit 8 (Paternity Judgment at 18 ¶¶ 14-15); Reply to Defendant's Statement of Uncontroverted Material Facts ¶ 14.

On YouTube, using the account @BALZYMAGEE, Chosich falsely claimed that Jackson's beard oil product is "literally snake oil" consisting of a "whole bunch of olive oil with a couple of dashes of them essential oils" and called Jackson a "scam artist." *See* Exhibit 2; Affidavit of Brad Jackson ¶ 4. Chosich also falsely claimed to have worked at Jackson's business. *See* Exhibit 2. These statements are factually incorrect—Jackson's beard oil contains eight different oils including hemp oil, avocado oil, rice bran oil, sweet almond oil, apricot kernel oil, and castor oil, with no olive oil whatsoever. *See* Affidavit of Brad Jackson ¶ 5; Reply to Defendant's Statement of Uncontroverted Material Facts ¶¶ 10-11.

Chosich accused Jackson of being a "drug dealer" who "sells drugs out of a BBQ grill on his front porch" and claimed Jackson raised GoFundMe money for "coke surgery." *See* Exhibit 4; Affidavit of Brad Jackson ¶ 9. While Jackson admits to a single offer to sell marijuana and psilocybin to Chosich five years ago before dispensaries opened, this isolated incident does not support the sweeping characterization of Jackson as a "drug dealer" engaged in ongoing criminal enterprise. *See* Affidavit of Brad Jackson ¶ 9.

The "coke surgery" claim is entirely false—Jackson underwent three medically necessary surgeries to repair a deviated septum and remove infected tonsils, followed

by rhinoplasty to address lifelong breathing problems. *See* Affidavit of Brad Jackson ¶¶ 9-10; Reply to Defendant's Statement of Uncontroverted Material Facts ¶ 17. Jackson has never used cocaine and could not due to his chronic nasal problems. *See* Affidavit of Brad Jackson ¶ 10.

In a May 10 Facebook post regarding allegations against Jakob Baxter, Chosich stated: "These messages could be going between Brad and his burner phone for all we know," implying that Jackson fabricated evidence of child sexual abuse. *See* Exhibit 5; Affidavit of Brad Jackson ¶ 11. This accusation is false and unsupported by any evidence. Jackson provided substantial documentation supporting his allegations against Baxter, including multiple witness accounts of predatory behavior targeting minors. *See* Affidavit of Brad Jackson ¶ 12; Exhibit 11 (evidence compilation).

Chosich's defamatory campaign extends beyond online posts to anonymous letters mailed to Jackson's family, friends, and neighbors. These letters contain information that could only have been known to Chosich and repeat the same false accusations about financial fraud, drug use, and mental health issues. *See* Affidavit of Brad Jackson ¶¶ 15, 29-32; Exhibit 12 (letter compilation). The letters describe Jackson as a "loser," "obese pig," and "dealer," and were designed to incite hatred and damage his reputation in the community. *See* Affidavit of Brad Jackson ¶¶ 31-32.

Chosich has continued making these false statements even during the pendency of this litigation, including repeating the false claim about olive oil in Jackson's beard oil product as recently as June 2024. *See* Affidavit of Brad Jackson ¶

14. This pattern of republication after notice demonstrates the ongoing nature of the defamatory campaign and supports findings of actual malice for punitive damages purposes.

2. <u>Missouri defamation law **requires** the Court analyze the defamatory statements on the basis of the full content of the statement and the entire context in which it was made.</u>

Pursuant to Missouri law, a private-figure need only prove the MAI 23.06 elements (publication, fault, defamatory meaning, of-and-concerning, and reputational injury) to recover actual damages; "actual malice" is not required for liability. *Englezos v. Newspress & Gazette Co.,* 980 S.W.2d 25, 30–31 (Mo. App. W.D. 1998) (holding fault standard applies; neutral reportage not recognized), and setting out the MAI elements at 31. The dispositive question is whether a reasonable reader could understand the words to imply verifiable facts. Expressions of 'opinion' may often imply an assertion of objective fact and simply couching such statements in terms of opinion does not dispel their factual implication. *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18–20 (1990).

Missouri courts read the words "…considered in context, giving them their plain and ordinarily understood meaning." *Sterling v. Rust Commc'ns, Inc.,* 113 S.W.3d 279, 282–83 (Mo. App. S.D. 2003). Missouri's Supreme Court likewise emphasizes ordinary meaning in context and recognizes falsity can arise from defamatory implications: "The issue of falsity relates to the defamatory facts implied by the statement … whether the underlying statement about the plaintiff is

demonstrably false." *Nazeri v. Missouri Valley Coll.*, 860 S.W.2d 303, 314 (Mo. banc 1993).

In Missouri, false accusations of crime are actionable per se (no special damages required). *Riss v. Anderson*, 304 F.2d 188, 193–94 (8th Cir. 1962) (collecting Missouri authority). False statements that directly tend to prejudice a person in his trade or business are likewise actionable. *Jacobs v. Transcontinental & W. Air, Inc.*, 216 S.W.2d 523, 525 (Mo. 1948) (rule stated); *Swafford v. Miller*, 711 S.W.2d 211, 214–15 (Mo. App. 1986) (discussing *Jacobs* line). Although rhetorical hyperbole is protected—but only where no reasonable reader would take it as asserting facts. *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13–15, 21–22 (1970) ("blackmail" as loose epithet in that context); *Henry v. Halliburton*, 690 S.W.2d 775, 787–88 (Mo. banc 1985). A fresh tweet or link can be a republication creating fresh liability; repeating after one is on notice of falsity supports malice for punitive damages. *Nunes v. Lizza*, 12 F.4th 890, 900 (8th Cir. 2021).

3. <u>Exhibit 3's statement that "…he tried to blackmail a city council member with nudes he claimed he had of her" is false and defamatory.</u>

Exhibit 3's statement reads in part as follows:

> "He has already managed to wiggle out of any accountability after his first ethics trial … where he tried to blackmail a city council member with nudes he claimed he had of her."

Plaintiff's affidavit explains that the Mattox ethics matter did not concern "blackmail with nudes," that Jackson himself filed the complaint, and that Mattox

later sent unsolicited sexual messages to him. *See Affidavit of Jackson* at ¶ 8 and generally Exhibit 11 (full text of complaint).

"Blackmail" here is not a vague epithet hurled in a heated negotiation (cf. *Greenbelt*, **398 U.S. at 13–15**). It purports to describe **specific criminal conduct**—an attempt to extort a city official **with sexual images**—and even identifies the **mechanism** ("nudes he claimed he had"). Under *Milkovich*, readers could "understand the speaker to communicate…an assertion of objective fact," and "simply couching" it as advocacy at an "ethics" hearing does not immunize the claim. *Milkovich,* **497 U.S. at 18–20.** Missouri likewise asks whether the **underlying implication is demonstrably false.** *Nazeri*, **860 S.W.2d at 314.** Accusing someone of attempted blackmail is an accusation of crime—slander/libel per se under Missouri law. *Riss*, 304 F.2d at 193–94 (Missouri rule that false charges of indictable offenses are actionable per se); *see also* RSMo § 565.090 (Definining extortion as felony) and RSMo 565.240 (unlawful internet posting).

The affidavit refutes the charge and shows the **ethics matter was about Mattox's false claim of advances**, not "blackmail with nudes," and that **Jackson** filed the ethics complaint. On this paper record, a jury could readily find falsity.

4. <u>Exhibit 3's statement that Jackson "...doesn't have a job, doesn't pay taxes, doesn't pay rent, doesn't pay child support..." is false and defamatory as a matter of law.</u>

Jackson's Affidavit proves on this record that Chosich's statement here is provably false and defamatory. Jackson is the owner/operator of Roughneck Beard

Company; his beard oil uses eight carrier oils and no olive oil (showing real business operations, Affidavit at 4-5); he files and pays taxes (tax returns as Ex. 13); the family-court judgment orders no child support (Affidavit at ¶ 6-7 and 50/50 custody).

The phrase "scam artist" sometimes can be hyperbolic, but not when tied to specific, verifiable product composition ("whole bunch of olive oil"). *Milkovich* makes clear that statements cast as opinions are actionable when they imply false facts. 497 U.S. at 18–20. And under Missouri's trade-libel rule, false statements that directly tend to injure the plaintiff in his business are actionable. *Jacobs*, 216 S.W.2d at 525; *Swafford*, 711 S.W.2d at 214–15. In *Henry*, the Court protected loose epithets where no reasonable listener would treat them as factual. 690 S.W.2d at 787–88. Here, however, the post purports to disclose inside product facts (he "worked at the company") and specifies ingredients; that signals factual reportage, not mere insult. *Sterling*, 113 S.W.3d at 282–83 (context / verifiability).

Whether someone has a job, pays taxes, pays rent, or owes (and fails to pay) child support are binary, provable facts. Under *Milkovich*, "opinion" labels do not shield such concrete assertions. 497 U.S. at 18–20. Missouri applies the same verifiability/context test. *Sterling*, 113 S.W.3d at 282–83. Stating that a father "doesn't pay child support" implies the existence of a legal duty and its nonpayment—conduct the public associates with criminal nonsupport. That defamatory implication is actionable where, as here, the underlying reality is that no child support was ordered. *Nazeri* confirms the falsity inquiry turns on the defamatory facts implied. 860 S.W.2d at 314. Likewise, "doesn't pay taxes" implies illegal tax evasion, not mere

opinion; Missouri permits suits for statements that injure one in his trade by imputing dishonesty or law-breaking. Jacobs, 216 S.W.2d at 525; Swafford, 711 S.W.2d at 214–15.

5. Exhibit 4's statement that "Brad Jackson is a drug dealer… sells drugs out of a BBQ grill on his front porch… [and] raised enough money on gofundme for his 'Coke surgery'" is false and defamatory.

Chosich called Jackson a **"drug dealer"** who **"sells drugs out of a BBQ grill,"** claimed he **doesn't pay taxes**, and said Jackson **raised GoFundMe money for a "coke surgery."** Jackson admits that five years ago—**before dispensaries opened**—he **offered** to sell marijuana/psilocybin to Chosich, but denies being a "drug dealer," affirms he **pays federal taxes** (tax returns attached), and explains the surgeries were for a **deviated septum/tonsils**, not cocaine, and that he has **never used cocaine**.

Calling someone a "drug dealer" and accusing him of selling drugs asserts felony-level conduct and is defamation per se in Missouri. *Riss*, 304 F.2d at 193–94. As above, "doesn't pay taxes" implies criminality and prejudices him in his business, actionable under *Jacobs*/*Swafford*. The "coke surgery" claim imputes illegal drug use and fraud on donors; it is verifiable and refuted by medical-need evidence in the affidavit. *See e.g.* Affidavit at 9.

Even if Jackson 5 years ago sold Chosich marijuana and offered to sell him psylocibin mushrooms, the tenor and gist of this statement is that of abject, ongoing criminality that is different and in kind and degree from that limited modicum of

truth. On its face, the statement is demonstrably false because it implies that Jackson has committed massive scale fraud, drug dealing, and child desertion. Selling CHosich marijuana is not a defense to the statement.

6. <u>The implication that Jackson manufactured evidence of the sexual abuse allegation against the third party is false and defamatory.</u>

Exhibit 3 – understood as required by Missouri law to include the entire context of that statement – states that Jackson falsely manufactured evidence to support his online postings concerning the child sexual abuse conduct of a third party. Even couched as "could be…for all we know," the gist is that Jackson faked messages—a verifiable accusation that he lied and fabricated evidence in a serious matter. Missouri squarely recognizes defamation-by-implication: falsity is evaluated by the defamatory facts implied by the words. *Nazeri*, 860 S.W.2d at 314; *Castle Rock*, 354 S.W.3d at 240 (quoting *Nazeri*). That statement is false. *Milkovich* likewise rejects the notion that adding "in my view" or "for all we know" transforms factual imputations into immune opinions. 497 U.S. at 18–20.

Likewise, the record shows Chosich's animus and campaign (e.g., calling Jackson "scum," urging a turnout to "knock [him]…down a peg," and dozens/hundreds of hostile posts; and, mailing letters to his neighbors calling him an "obese pig" and including prints of comments that he made).  Repeating and doubling-down online after notice supports a republication inference and can support actual malice for punitive damages. *Nunes*, 12 F.4th at 901–04.

The Jackson affidavit – again, Chosich has not bothered to actually depose Plaintiff Jackson, and therefore the affidavit is undisputed – plainly establishes that Jackson did **not** manufacture such evidence. Affidavit at 12-13. Likewise, Exhibit 11 provides detailed proof that Jackson had at minimum support for his allegations, if not definitive legal proof.

7. <u>Chosich's mailing of letters to family, friends and neighbors that reprint verbatim his Facebook quotes satisfies the element of "republication" to support an award of punitive damages.</u>

Chosich mailed a collection of letters to Jackson's family, friends and neighbors. See e.g. Exhibit 12 at 11; Statement of Additional Material Facts, ¶ 22. The letters contain a collection of quotes from Facebook quotes by Chosich or others in his milieu that are on their face categorically false and unwarranted. *Id.* Republishing and repackaging the above described falsehoods, and mailing them to random individuals like his neighbors is repugnant and deserves significant punishment.

For example, Chosich mailed copies of letters from a faked corporate account indicating that Jackson had somehow committed wire fraud by making donations to a go-fund-me page supporting a concert venue in Nashville. Exhibit 12 at 1-2. As described in the Affidavit of Brad Jackson at ¶ 31, the Go-Fund-Me letter and the letters to Jackson's family, friends and neighbors plainly contain content that more likely than not originated from Chosich – only he could have access to such information, because it contains direct messages private only to Chosich and Jackson;

and, the content of the letters contains actual quotes from posts made by Chosich, including the cocaine surgery allegation. See Exhibit 12 at 3-6.

Jackson's affidavit (¶¶ 31-32) establishes the scope and content of the anonymous letter campaign. The letters were sent to multiple recipients including:

- Angela Lappin (neighbor): Page 6 contains Chosich's screenshot with text messages sent to Chosich, describing Jackson as a "loser," "obese pig," and "dealer" (Affidavit ¶ 31)
- Jackson's parents: Pages 9-12 contain letters falsely claiming Jackson has "significant mental health problems that need urgent treatment," purportedly from the "Maplewood community" (Affidavit ¶ 31)
- The Tomkos (neighbors): Page 13 contains duplicate copies of the Lappin letter (Affidavit ¶ 31).

The letters contain information that "could only have been derived from Defendant Chosich," establishing both publication and the defamatory republication element:

1. **Page 3**: Contains "a text message sent from me to Defendant Chosich" (Affidavit ¶ 31)
2. **Page 4**: "Continued allegations of fraud regarding the purported 'cocaine surgery'" received "near in time to Chosich's above described post" (Affidavit ¶ 31)
3. **Page 6**: Contains "a screenshot of Chosich's post, with the text message that was sent to Chosich" (Affidavit ¶ 31)

This evidence satisfies Missouri's publication requirement and establishes Chosich as the source. Under *Englezos v. Newspress & Gazette Co.*, 980 S.W.2d 25, 31 (Mo. App. W.D. 1998), Missouri applies the fault standard for private figures, and this evidence clearly meets that threshold.

The letters amplify the original defamatory statements with additional false and defamatory content. The letters repeat and enhance accusations that Jackson is a "dealer," building on the "drug dealer" accusations from the Facebook posts. Under *Riss v. Anderson*, 304 F.2d 188, 193-94 (8th Cir. 1962), false accusations of crime are actionable per se in Missouri. Describing Jackson as an "obese pig" and claiming he needs "urgent treatment" for "significant mental health problems" constitutes defamatory content designed to injure his reputation and social standing. The systematic targeting of neighbors and community members with false accusations directly tends to injure Jackson's business relationships and community standing, actionable under *Jacobs v. Transcontinental & Western Air*, 216 S.W.2d 523, 525 (Mo. 1948).

Under Missouri law, "each repetition" of defamatory content constitutes a separate publication creating independent liability. *Nunes*, 12 F.4th at 901-04. The anonymous letters represent multiple distinct publications to new audiences. The letters were sent months after the original Facebook posts, representing deliberate republication rather than contemporaneous publication. Each letter targets different recipients (neighbors, family, friends) who may not have seen the original Facebook posts. And, The letters contain additional defamatory material beyond the original posts.

The letters demonstrate the "pattern of hostile posts" and "campaign" referenced in the record. The systematic nature of sending anonymously-authored letters containing private communications shows systematicity. Chosich deliberately

identified Jackson's family, neighbors, and community members for targeted defamation. He included private text messages sent to Chosich demonstrates abuse of personal communications to enhance defamatory impact. And, the anonymous nature shows consciousness of wrongdoing and intent to avoid responsibility while maximizing reputational damage.

WHEREFORE, Plaintiff urges the Court <u>deny</u> Defendant's Motion for Summary Judgement, for the reasons stated in this Memorandum, and for such further relief as may be just and proper.

Respectfully submitted,

**OTT LAW FIRM**

*(signature)*

Joseph A. Ott, #67889
3544 Oxford Blvd
Maplewood, MO 63143
Telephone: (314) 293-3756
Facsimile: (314) 689-0080
joe@ott.law
*Attorneys for Plaintiffs*